UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SUSAN MAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-00433-SEB-MG |
| | ) | |
| HEART OF CARDON LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on the Motion for Summary Judgment [Dkt. No. 39] filed by Defendant, Heart of CarDon, LLC ("CarDon"), pursuant to Federal Rule of Civil Procedure 56. Plaintiff Susan May ("Ms. May") has brought this litigation against Defendant alleging violations of the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et. seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq*. For the following reasons, the Court <u>GRANTS</u> CarDon's Motion.

**<u>Factual Background</u>**

These facts are presented in the light most favorable to Ms. May because she is the non-moving party and inferences are therefore resolved in her favor. *Wilson v. Regal Beloit Am., Inc.*, 521 F. Supp. 3d 760, 764 (S.D. Ind. 2021) (citing *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

**General Background**

CarDon is a limited liability corporation that runs senior living facilities across Indiana. Lincoln Hills is a CarDon facility located in New Albany, Indiana. (Povinelli. Decl. ¶ 3.) Plaintiff Susan May is a nurse, holding her Bachelor of Science in Nursing, Master of Science in Nursing, Master of Business Administration, and Family Nurse Practitioner license. (May Dep. 8:7–9:4.) She is a forty-year-old African-American woman. (May Dep. 6:17, 66:9–12; Dkt. No. 41-1, 39.)

Ms. May first began working as a floor nurse at CarDon in either 2008 or 2009 (May Dep. 147:22–148:1; 10:10–12). After approximately three years, Ms. May moved to Kendrick Hospital in downtown Louisville while working toward becoming a Registered Nurse ("RN") (May Dep. 10:20–11:23), which she accomplished in 2012 (May Dep. 12:3). Ms. May later returned to Lincoln Hills where she worked for three years as a unit manager while working toward her BSN, which degree she earned in 2015. (May Dep. 12:3–19.) Eventually Ms. May left this position and took up work as a traveling nurse (May Dep. 13:8–12) as well as serving in a similar role at a correctional facility (May. Dep. 16:18–17:4) before returning to CarDon. CarDon rehired May on August 3, 2017.  It is unclear on the record before us whether she was originally hired back as a full-time RN (Registered Nurse) or as a PRN (Pro Re Nata), this latter status being designated as as-needed with no benefits (May Dep. 14:1–16, 21:5–8), but it is undisputed that at some point following her return in the summer of 2017, she began working as an RN and unit manager, and eventually became the Director of Nursing.

(May Dep. 52:3–9, 61:18.) She held that position with CarDon until May 2021, at which time the facts underlying this cause of action occurred.

**Employee Handbook and Company Policies**

Although Ms. May asserts that she never received or had access to an employee handbook (May Dep. 23:1–22), she appears to have signed a document on August 3, 2017, the day she was rehired, indicating that she had in fact received the employee handbook (May Dep. 23:1–22; Ex. 3) (the "Handbook"). This Handbook, entitled "New Hire Orientation Guidebook,"[1] outlines many of the company's policies, including its at-will employment policy. Although Ms. May insists that she has never seen the Handbook (May Dep. 26:9–14), she has testified that she is familiar with at-will employment and knew that employees at CarDon could be dismissed for any reason without notice (May Dep. 27:8–14).

The Handbook also outlines CarDon's Equal Employment Opportunity policy, its discrimination and harassment free workplace policy, and its grievance procedures. (Ex. 30, 9–11.) Notably, one of CarDon's Handbook policies requires employees who have been diagnosed with a healthcare condition to acquire and provide a release before returning to work. (Ex. 5, 30.)[2] Although Ms. May retained no memory of this policy, she

---

[1] While the form refers to the handbook as the "Lincoln Hills Health Center Employee Handbook," we understand it to be one and the same as the "New Hire Orientation Guidebook," marked as Exhibit 5.

[2] This policy pertains to employees taking Company Leave, which is one form of leave employees may take to account for three or more consecutive absences. (Ex. 5, 30.)

acknowledges that a release requirement before returning to work would not have been unusual. (May Dep. 36:3–6.)

On December 28, 2017, Ms. May signed a General Orientation Checklist, which indicated that she received the company's policies, such as their benefits information, safety procedures, and leaves of absence. (Exs. 2, 4; May Dep. 20:18–22:4.) As with the Handbook, Ms. May asserts that she did not have access to the policies themselves.  She also claims that there was no actual orientation and that the company had her sign the forms only to comply with regulations. (May Dep. 21:3–22:4.) Ms. May concedes that she could have received the policies by asking human resources (May Dep. 25:5–9), but she never felt the need to acquire copies of. (May Dep. 25:10–12.)

**Plaintiffs' Resignation Letters**

On April 19, 2018, while Ms. May was employed with CarDon as an RN, she submitted what turned out to be her first letter of resignation, informing the company at the time that she was willing to stay on as a PRN. (May Dep. 53:8–25.) Ms. May ultimately neither resigned nor switched roles; instead, she continued to work as a unit manager before submitting a second resignation effective September 28, 2018. (*Id.* at 55:7–22).  That resignation also never materialized as such, since Ms. May continued working full time for CarDon as an RN (*Id.* at 57:13–34.) In June 2019, Ms. May applied for the Director of Nursing position (*Id.* at 57:13–15.) Though she was initially denied the

promotion (*Id.* at 58:13),[3] she was later selected for the position in May 2020 and remained the Director of Nursing throughout her tenure at CarDon. (*Id.* at 61:17–18).

Ms. May submitted a final resignation letter to her supervisor, Kim Povinelli, on April 26, 2021. (May Dep. 94:13–95:7; Ex. 14.) That letter designated Ms. May's final day of work as May 26, 2021. (Ex. 14.) Two weeks before Ms. May's projected final day, on May 12, 2021, state governmental officials arrived at Lincoln Hills to conduct an annual audit. (Povinelli Dep. ¶ 6.) During the week-long audit, the State determined from a review of the records whether Lincoln Hills had the required documentation in order along with evidence of the necessary levels/kinds of clinical support to be permitted to continue operations. (Povinelli Decl. ¶ 6.)

**Plaintiff Experiences Chest Pain and Leaves Work**

On May 12, 2021, Ms. May began experiencing chest pain at the beginning of the workday (May Dep. 103:10–15), the same day CarDon's State audit commenced. Because of her chest pain, Ms. May left work early to go to the University of Louisville Southwest Hospital emergency room. (May Dep. 40:19–22). Ms. May informed Ms. Povinelli, Human Resources personnel Rena Watson ("Watson"), and staff development Jessica Jones ("Jones") that she needed to leave work early. (May Dep. 40:13–18.) While the record before us does not indicate precisely when Ms. May left work to go to the

---

[3] Ms. May has not challenged her failure to receive the DON position, and although she references racially-charged hiring decisions in her deposition, Ms. May has not challenged those decisions as racially discriminatory in her lawsuit.

hospital (May Dep. 40:9–12; 149:17–150:14), the medical records in evidence indicate that she was admitted to the hospital at 4:05 p.m. on May 12, 2021. (Ex. A, 34.)

At some point during her hospital visit on May 12, Ms. May phoned Ms. Povinelli and Ms. Watson to inform them that the hospital had given her either "a couple days off" or "one to two days off" because of her chest pain. (May Dep. 106:14–22; 119:5–7.) The doctor opined to her that a panic attack may have caused her chest pain (May Dep. 41:22–25). The hospital advised Ms. May to contact a healthcare provider should further episodes occur. (Ex. A, 53–54; May Dep. 41:1–21.) The physician's notes indicate that the cause of the chest pain was emotional stress and that Ms. May had told the doctor that the stress may have been caused by her upcoming nurse practitioner board exams. (Ex. A, 39.)

Ms. May believes that she was released from the hospital either late at night on May 12 or early in the morning on May 13. (May Dep. 156:16–26; 157:3–7.) The release issued by her doctor permitted her to return to work on May 14. (Ex. A, 57.) Defendant asserts that Ms. May also texted Ms. Povinelli and Ms. Watson on May 13 at 4:10 p.m. saying that she would be off work until May 18. (Dkt. 40, 6.) Ms. May concedes that she remembers sending a text message to Ms. Watson and Ms. Povinelli (May Dep. 133:16–22), but contends that she never identified May 18 as her return date.

**Plaintiff Returns Early to Work and Is Told to Leave**

In any event, there is no dispute that Ms. May returned to work prior to May 14, the date her release permitted her to return. Ms. May asserts that she returned to work to check on a patient after she had received a concerning text from the patient's family

member about the patient's treatment in the facility. (May Dep. 111:14–20, 112:5.) There is some dispute between the parties as to whether Ms. May returned to work on May 12 or May 13 (Dkt. No. 40, 7; Dkt. No. 44, 3). However, viewing the facts most favorably to Ms. May, we find that her latest possible return was the evening of May 13. (May Dep. 112:12–15, 136:22–24, 156:12–157:2.) Therefore, it is undisputed that she had returned to work prior to her release date of May 14. (Dkt. No. 41-1, 57).

Upon returning to work, Ms. May discovered that her office belongings had been boxed up and put to the side in her office. (May. Dep. 112:6–11.) She called Ms. Povinelli to inquire about the state of her things. (May Dep. 112:16–21.) Ms. Povinelli replied that facility workers had been using Ms. May's office during the State's audit. (May Dep. 134:6–10.) The parties dispute what specifically was said during the subsequent conversation. Ms. May maintains that Ms. Povinelli told her that "it's in the best interest that [May] take [her] things and leave and don't return to the building." (Dkt. No. 44, 5; May Dep. 112:16–21.) CarDon, on the other hand, represents that Ms. Povinelli told Ms. May that Ms. Povinelli "assumed May was not returning due to her 'cardiac problem' and that it would be best for May to take her things and go." (May Dep. 157:22–158:6.) In support of its version of this conversation, CarDon cites Ms. May's amended complaint (Dkt. No. 12, ¶ 14; Ex. 21) as well as her deposition testimony in which she conceded that her statement set out in her EEOC charge cited Ms. Povinelli's reference to the cardiac problems, and that she (May) considered the EEOC charge statement accurate. (May Dep. 157:20–158:6.)

Following Ms. May's conversation with Ms. Povinelli, Ms. May called Human Resources, who indicated they had no knowledge of anything about this situation, though it is not clear which Human Resources employee Ms. May spoke with during that conversation. (May Dep. 112:22–1.) When thereafter Ms. May retrieved her box and started to leave the building, the receptionist ("Vanessa"), apparently acting in response to a conversation with Ms. Povinelli, asked Ms. May if she had turned in her keys and computer. (*Id.* at 113:2–7.) Since she had already left her computer (*Id.*), Ms. May handed back her keys to another employee located near the front of the building, who gave the keys to Vanessa. (May Dep. 113:8–12.)

As noted, CarDon's Company Leave policy requires a signed release in order to return to work whenever an employee's leave is due to her "own medical condition as certified by a health care provider." (Ex. A, 30.) CarDon asserts—and Ms. May does not dispute—that this policy applied to her absences. (Dkt. No. 40, 16; Dkt. No. 44.)[4] Ms. Povinelli testified that she understood company policy to require Ms. May to secure a doctor's work release before returning to work and that the reason she directed Ms. May to leave the building on May 13, 2021 was because May had not presented a doctor's work release permitting her to return that day. (Povinelli Decl. ¶¶ 9–10.) ("Per CarDon's policy, I asked Ms. May to leave the building because I believed she was present at the facility before she was released by her doctor and because she did not otherwise have a

---

[4] CarDon requires employees to take approved leave when there is an absence of three or more days. Company Leave is available on a discretionary basis and may be available to employees for the employee's own health condition or for a personal emergency (Ex. A, 26, 29.)

doctor's work release permitting her to be at the facility that evening.") Apparently, Ms. May did not attempt to present such a release to any CarDon employee. (May Dep. 136:16–137:3.) Moreover, as discussed above, the release Ms. May did receive from her doctor did not permit her return to work until May 14. (Dkt. No. 41-1, 57.)

**Events Following May 13, 2021**

Ms. May never returned to work following her departure on May 13. Ms. May asserts that she never returned because Ms. Povinelli instructed her not to. (May Dep. 136:16–137:3.) Ms. May also never sought further medical attention for her chest pain following the May 12 incident, although she asserts that she still experiences intermittent chest pain. (May Dep. 45:2–7.) According to Ms. May's EEOC complaint, her position eventually was filled by a Caucasian individual. (Ex. 19.)

**Pejorative Statements**

Ms. May alleges that, on one occasion prior to the May 13th incident, Ms. Povinelli made pejorative comments about another African American employee, one DeMarco ("DeMarco"), including a statement that "this kind don't act right" and that "they complained too much." The precise timing of Ms. Povinelli's statements is not specified in the briefing, but Ms. May testified that they occurred within a few months prior to her final departure from CarDon. (May Dep. 152:13–16.) Ms. May never reported these comments to anyone within CarDon nor ever heard Ms. Povinelli make any other similar comments about African American employees. (*Id.* at 152:20–153:6.) Ms. Povinelli does not deny making these comments but asserts that they were in reference to DeMarco's age, not his race (Povinelli Decl. ¶ 14), and that when she made

the comments, Ms. May and she "were talking about the younger generation's general work ethic." (Povinelli Decl. ¶ 14.) Ms. May estimates that DeMarco was about twenty years of age at the time of Ms. Povinelli's statements (May Dep. 178:21–24), and she concedes that Ms. Povinelli could have been referencing DeMarco's age instead of his race as Ms. Povinelli never specifically referenced DeMarco's race. (May Dep. 178:12–17.)

**Plaintiff's Prior Health History**

The May 12th chest pain episode was not the first instance of such for Ms. May during her tenure at CarDon. Ms. May had made a previous request for additional staffing because she had been experiencing chest pain and depression due to the stress of her job. (May Dep. 48:19–50:1.) Ms. May had been prescribed antidepressants to deal with these symptoms, a fact she had disclosed to Ms. Watson. (May Dep. 45:23–46:6, 46:16–47:4.) During the May 12th emergency room visit, Ms. May's doctor ascribed her "achy chest" symptoms to "emotional stress" and anxiety. (Dkt. No 41-1, 39; May Dep. at 106:14–22). According to Ms. May, the combination of her depression, anxiety, and chest pain created a qualified disability of which CarDon was aware, because she had previously disclosed these symptoms to CarDon. (Dkt. No. 44, 10.)

**Similarly Situated Employees**

Ms. May has identified the following CarDon employees as persons she believes were similarly situated to her who were also treated more favorably: Cherry Tolson as a comparator for her disability discrimination claim, and Dana Gerdon, Ricky Baker, and Nancy O'Neal as comparators for her race discrimination claim. Ms. May claims that Ms.

Tolson, an African American woman who was employed by CarDon as an RN, was treated more favorably in that Ms. Tolson was permitted by CarDon on at least one occasion to leave work to go to the emergency room and then allowed to return to work, apparently without a medical release. (May Dep. 122:7–124:4.) However, according to CarDon, Ms. Tolson's situation is not comparable to Ms. May because unlike May, Tolson had a serious, ongoing health condition that required her use of intermittent leave under the Family Medical Leave Act and Tolson was never permitted to return to work after experiencing a health emergency before being released by a doctor. (Povinelli Decl. ¶ 15.)

The other employees identified by Ms. May are all Caucasian. Ms. May asserts that Ms. Gerdon was treated more favorably by having been given an easier schedule, making "it … hard for [May] to discipline [her]"; that Mr. Baker was treated more favorably because, "if he was disciplined [by Ms. May], he would go to [Ms. Povinelli]"; and that Ms. O'Neal was treated more favorably because "anything [Ms. May] would say to her, it would be between [corporate] and [Ms. Povinelli]." (May Dep. 166:17–167:9, 167:18–21, 169:13–19.) Eventually, both Ms. Gerdon and Ms. O'Neal were fired after Ms. May reported her concerns about them to HR and Ms. Povinelli. (May Dep. 167:10–14, 168:13–24.)

**The Instant Litigation**

Ms. May filed her complaint in this lawsuit on December 20, 2021, after receiving her Notice of Right to Sue from the EEOC on November 8, 2021. Ms. May amended her complaint on February 4, 2022, alleging race and disability discrimination under Title VII

and the ADA. Defendant moved for summary judgment on all these claims on January 18, 2023, which motion is now fully briefed and ripe for ruling.

## Legal Analysis

### I.      Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when no genuine issue of material fact exists. Fed. R. Civ. P. 56(c). The court does not weigh the evidence or decide which inferences to draw from the facts. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). Rather, as discussed above, we view the facts in the light most favorable to the non-moving party and make inferences in her favor. *Johnson*, 892 F.3d at 893 (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 814 (7th Cir. 2017)). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Wilson v. Regal Beloit Am., Inc.*, 521 F. Supp. 3d 760, 768 (S.D. Ind. 2021) (quoting *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007)) (quotation marks omitted). The party bearing the burden of proof must show, through specific factual allegations, that a genuine issue of material fact exists that requires trial. *Wilson*, 521 F. Supp. 3d at 768 (citing *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007)). Additionally, because employment discrimination cases are extremely fact-intensive, "neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Wilson*, 521 F. Supp. 3d at 768 (citation and quotation marks omitted).

## II.     Discussion

Plaintiff May claims in this lawsuit that she was constructively discharged because of her race and disability, (specifically her chest pain), in violation of Title VII and the ADA. (Dkt. No. 44, at 7; Am. Compl.  ¶¶ 14, 17–24.) Our analysis of these claims invokes the Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), which states that, regardless of whether the court uses the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or some other framework to evaluate a plaintiff's employment discrimination and retaliation claims, "the ultimate legal question 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Reed v. Freedom Mortg. Corp.* 869 F.3d 543, 547 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765).

Under this "simplified" approach, the "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself–or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Ortiz*, 834 F.3d at 765.  Because Ms. May has chosen to prove her discrimination claims pursuant to the *Ortiz* standard, we follow her lead and consider the evidence holistically.  Ms. May must thus establish that (1) she experienced an adverse employment action, and (2) the evidence, considered as a whole, would permit a reasonable factfinder to conclude that her race or disability caused that adverse employment action. *See Ortiz*, 834 F.3d at 765; *see also Garcia v. AT&T Corp*., No. 20 C 3608, 2022 WL 2527996, at *3 (N.D. Ill. July 6, 2022) ("To prove a claim for [race] discrimination under Title VII[] … or disability

discrimination under the ADA, [a plaintiff] must demonstrate that the evidence, considered as a whole, would permit a reasonable factfinder to conclude that [her race] or disability caused an adverse employment action.").

## A.    Adverse Employment Action

We first address whether the evidence presented by Ms. May would permit a fact finder to conclude that she suffered an adverse employment action, which is a required element of proof in order to prevail on her discrimination claims under both Title VII and the ADA. *See Ortiz*, 834 F.3d at 765; *see also Garcia v. AT&T Corp.*, 2022 WL 257996, at *3. CarDon argues that because Ms. May was not terminated and instead voluntarily quit with no notice, she cannot establish this essential element of her discrimination claims.  Ms. May, however, contends that she did not return to work because she was constructively discharged[5] and thus did suffer an adverse employment action.

"Constructive discharge … constitute[s] an adverse employment action and is deemed to have occurred when 'the plaintiff … show[s] that she was forced to resign because her working conditions, from the standpoint of the reasonable employee, had become unbearable.'" *Fischer v. Avanade, Inc.*, 519 F.3d 393, 408–09 (7th Cir. 2008) (quoting *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002)).  Seventh Circuit precedent permits a plaintiff to make this showing in one of two ways. "Under the first, a plaintiff resigns due to discriminatory harassment and must show working

---

[5] Courts in the Seventh Circuit have considered quitting without notice to be a form of resignation for a constructive discharge analysis. *See, e.g.*, *United States EEOC v. United Air Lines, Inc.*, No. 98 C 7829, 2000 WL 1738346 (N.D. Ill. Nov. 21, 2000) (interpreting a plaintiff who quit without notice as having resigned for purposes of constructive discharge).

conditions even more egregious than that required for a hostile work environment claim." *Ziccarelli v. Dart*, 35 F.4th 1079, 1091 (7th Cir. 2022) (internal quotation marks and citation omitted). Under the second theory of constructive discharge, a plaintiff can prevail when she shows that her working conditions had become unbearable because "*the employer's actions* communicate[d] to the employee that she immediately and unavoidably w[ould] be terminated." *Id.* (internal quotation marks and citation omitted); *accord Fischer*, 519 F.3d at 409 ("[W]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to a constructive discharge.") (quotation marks and citation omitted).  "Under either theory, the standard is very high: the plaintiff must show that the workplace had become objectively 'intolerable.'" *Royston v. DeJoy*, 1:18-CV-01697, 2021 WL 4502217, at *6 (N.D. Ill. Sept. 30, 2021) (quoting *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010)).

Here, Ms. May has proceeded under the second theory of constructive discharge. Specifically, she claims that, upon her return to work from the hospital on May 13th, her belongings had been packed up in a box and State audit work was being conducted in her office.  When she inquired about the situation, she was told by Ms. Povinelli something to the effect that it was best for her to "take [her] things and go and not return." May Dep. at 158:8–9. Ms. May thus took her belongings and exited the building, and as she was doing so, she was asked to leave behind her keys and laptop.  Given these circumstances,

Ms. May argues, it was reasonable for her to have believed that she was being terminated and therefore she did not return to work.[6]

In support of her claim that she was constructively discharged, Ms. May cites the Seventh Circuit's decision in *EEOC v. University of Chicago Hospitals*, 276 F.3d 326, 332 (7th Cir. 2002), where the court held the plaintiff had met its burden of showing constructive discharge under circumstances where the employee had arrived at work following a vacation to find that her belongings had been packed up and her office was being used as storage. *Id.* There, however, the court also determined that this evidence was "underscored by the other evidence pointing to [the employee's] imminent termination," including significant changes in her evaluations, accusations that she had failed to follow directives, hostility toward her religious beliefs, and evidence that she had been told that her superior was trying to force her to quit. *Id.* at 330, 332. Based on all of this evidence, the court concluded that such a working environment "could have indeed been to a reasonable employee unbearable." *Id.* at 332.

In contrast here, although Ms. May returned to work to find her belongings packed in a box and her office being temporarily used as a base for the ongoing State audit work, circumstances similar to those of the employee in *University of Chicago Hospitals*, this case does not fit as easily into the constructive discharge framework. Ms. May, unlike

---

[6] There is some dispute between the parties here as to what was actually said during Ms. May's conversation with Ms. Povinelli (e.g., whether Ms. Povinelli explained that Ms. May could not be at work without a medical release) and whether Ms. May was directed to return her keys and laptop or merely asked whether she had left them upon her exit. As required, we have recounted the facts above in the light most favorable to Ms. May.

the employee in *University of Chicago Hospitals*, had already submitted her letter of resignation prior to the transpiring events that she claims constituted her constructive discharge. Accordingly, she does not contend that her *employer's actions* rendered her working environment intolerable, forcing her to quit, but rather, simply, that she reasonably believed based on Ms. Povinelli's comments that she had been fired in advance of her planned May 26, 2021 departure date, and therefore under the mistaken impression that she had been terminated, she did not return for the final two weeks of her scheduled employment without seeking clarification or confirmation from her employer that she had in fact been let go.

Other than her final conversation with Ms. Povinelli, Ms. May cites no other evidence to support a conclusion that her termination was "imminent," that "the handwriting was on the wall," that "the axe was about to fall" or that her work environment had in any other sense become intolerable. *Id.* In fact, Ms. May was not subject to any negative feedback or other indication of her impending termination ahead of the relevant incident. The evidence establishes that Ms. May actually had received positive feedback over the course of her tenure with Lincoln Hills, including receiving a promotion to the Director of Nursing position. Ms. May was never "told repeatedly that [s]he [was] not wanted" and that she "ha[d] no future" such that deciding "to remain with [her] employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 655 (7th Cir. 2000).

For these reasons, despite viewing the facts in the light most favorable to Ms. May as we are required to do on summary judgment, we cannot conclude that she was subject to objectively intolerable working conditions as is required to establish the elements of a constructive discharge.

### B.      On the Basis of Disability or Race

Assuming that Ms. May could establish that she was constructively discharged, to survive summary judgment, she must still must be able to show that a reasonable jury could find that her constructive discharge was the result of discrimination based on her disability or race.  Here, the evidence does not permit a conclusion by a reasonable factfinder that CarDon constructively discharged Ms. May because of a prohibited characteristic.  We address her disability and race discrimination claims in turn below.

### 1.   Disability Discrimination Claim

To invoke the protections under the ADA, Ms. May must demonstrate that: (1) she has a disability as defined by the statute; (2) she is otherwise qualified to perform the essential functions of her job either with or without reasonable accommodation; and (3) she suffered an adverse employment action because of her disability.  *Dvorak v. Mostardi Platt Assoc., Inc.*, 289 F.3d 479, 483 (7th Cir. 2002).  Here, Ms. May's claim falters at the outset because she has not established that she is a qualified individual with a disability under the ADA.  Moreover, even if she could establish that she is disabled as defined by the ADA, she has failed to create a causal connection between her disability and her purported constructive discharge.

Under the ADA, a protected disability is defined as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).  Ms. May has introduced no evidence to establish that her periodic and temporary chest pain—considered either alone or in conjunction with the fact that she was required to take antidepressants and suffered from anxiety—substantially limited one or more of her major life activities.  In fact, beyond a general listing of examples of major life activities, Ms. May does not specifically identify any major life activity in which she was substantially limited.  Nor has she adduced evidence establishing that she had a record of such an impairment or that CarDon at any point regarded her as being so limited.

After a medical examination following Ms. May's report of chest pain on May 12, 2021, the ER doctor attributed her pain to "achy chest / discomfort" and concluded that she likely had experienced a panic attack.  The ER doctor advised her to follow-up with her primary care physician if the chest pains returned and, although Ms. May contends that she still suffers from "off and on chest pains," she never sought treatment for such pain after May 12. This scant evidence, without more, is wholly insufficient to support the conclusion that Ms. May's periodic chest pains and/or depression and anxiety substantially limited her ability to perform any major life activity. *See Brunker v. Schwan's Home Serv., Inc.*, 583 F.3d 1004, 1008 (7th Cir. 2009) (finding that an impairment that causes only "intermittent difficulties" rather than a substantial limitation on a major life activity is not a disability under the ADA).

19

Nor is it sufficient that Ms. May had disclosed to CarDon that she was on antidepressants, and at some point prior to May 12 had discussed with CarDon potentially needing additional staffing due to her work stress to establish that CarDon regarded her as substantially limited in any major life activity. At most, Ms. May has shown that CarDon knew and understood that she suffered from a temporary condition that required medical attention when it occurred. That awareness does not establish that CarDon at any point regarded her to be disabled. The insufficiency of evidence dooms Ms. May's disability discrimination claim, given that "[t]he Act is not a general protection of medically afflicted persons …. If the employer discriminates against [an employee] on account of their being (or being believed by him to be) ill, even permanently ill, but not disabled, there is no violation." *Christian v. St. Anthony Med. Ctr., Inc.*, 117 F.3d 1051, 1052–53 (7th Cir. 1997). Having fallen short in her effort to establish that she is a qualified person with a disability, Ms. May's ADA claim necessarily fails.

Even assuming Ms. May succeeded in making such a showing, she has adduced no evidence of a causal connection between any disability and her alleged constructive discharge. The primary evidence Ms. May relies upon in support of her disability discrimination claim is suspicious timing,[7] to wit, that she "was terminated the day after

---

[7] In her deposition, Ms. May testified that on unspecified occasions CarDon had permitted other employees to leave for medical reasons and return to work without a doctor's release. However, in response to Defendant's summary judgment motion, Ms. May appears to have abandoned any argument that similarly situated employees who were not disabled were treated more favorably. Because undeveloped or unsupported arguments are considered waived in the Seventh Circuit, we do not address this argument further. *See, e.g.*, *Greenbank v. Great Am. Assurance Co.*, 47 F. 4th 618, 629 (7th Cir. 2022) ("We have made clear that perfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority are waived.").

she left work early to be treated for anxiety-related chest pain." Dkt. 44 at 10. However, it is well-established under Seventh Circuit precedent that "temporal proximity, absent other evidence of pretext, is rarely enough," to raise an inference of discriminatory intent. *Markgren v. Saputo Cheese USA, Inc.*, No. 21-cv-429-jdp, 2023 WL 3568967, at *8 (W.D. Wis. May 19, 2023) (citing *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)). There is no such evidence of pretext cited here.

According to CarDon, the legitimate, nondiscriminatory reason Ms. Povinelli required Ms. May to leave the Lincoln Hills facility on May 13 was because Ms. May had not presented a doctor's release authorizing her return to work, which Ms. Povinelli testified she understood was a requirement under Company policy before May could be cleared to return to work. (Dkt. No. 40, 21; Povinelli Decl. ¶¶ 9–10.) Ms. May concedes that she informed Ms. Povinelli on May 12 that she would be absent from work because of her chest pain and that her doctor had told her she needed to be off work for at least one or two days, yet she voluntarily returned early because she believed that one of the patients needed her. Ms. May has adduced no evidence establishing that on the day she attempted to return to work she had presented Ms. Povinelli with a doctor's release as CarDon's leave policy required. Moreover, even if she had produced such a document, it would have stated that May could not return to work until May 14, 2021, which is the day after the latest date on which both parties agree May had attempted to return. These facts fall demonstrably short of the kind of evidence that would support a finding of pretext.

"Pretext means 'more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action.'" *Brooks v. Avancez*, 39 F.4th 424, 435

(7th Cir. 2022) (quoting *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015)). If CarDon "honestly believed its reasons for taking the challenged actions, even if those reasons were incorrect, then the reasons were not pretextual." *Brooks*, 39 F.4th at 435 (internal quotation marks and citation omitted). We do not evaluate whether the employer's proffered reason was accurate or unfair; instead, we assess only whether the reason was honestly believed. *Id.* at 436 (internal citations omitted). Ultimately, the only relevant question is whether Ms. Povinelli "honestly believed [she] had a non-discriminatory reason for [the adverse employment action]." *Id.* We ask only whether Ms. Povinelli's stated reason—that she asked Ms. May to leave the facility because Povinelli believed Ms. May was at CarDon without a legitimate doctor's release and therefore in violation of company policy—was honest.

Ms. May has failed to identify any "weaknesses, implausibilities, inconsistencies, or contradictions" in CarDon's reason that would "permit a reasonable person to conclude that the stated reason[] [is] unworthy of credence." *Crain v. McDonough*, 63 F.4th 585, 593 (7th Cir. 2023) (citation and internal quotation marks omitted). There is no evidence that Ms. Povinelli was lying or had dishonest motives; to the contrary, Ms. May has agreed, when asked during her deposition, that it was not unreasonable for Ms. Povinelli to tell her that she could not be at the CarDon facility when she returned following her hospital visit without a doctor's release. (May Dep. 119:16–22.)  Under these circumstances, viewing the evidence as a whole, and, again, in Ms. May's favor with regard to any disputes, no reasonable fact finder could conclude that Ms. May was

constructively discharged because of her disability. CarDon is therefore entitled to summary judgment on Ms. May's disability discrimination claim.

### 2. Race Discrimination Claim

Title VII prohibits an employer from discriminating against an employee "'with respect to h[er] compensation, terms, conditions, or privileges of employment' because of the employee's 'race, color, religion, sex, or national origin.'" *Barnes v. N. Ind. Pub. Serv. Co.*, 266 F. Supp. 3d 1110, 1117 (N.D. Ind. 2017) (quoting 42 U.S.C. § 2000e–2(a)(1)). There is no dispute that Ms. May is in a protected class based on her race, (African American), and therefore the only question is whether a jury could find that Ms. May was constructively discharged because of that protected characteristic.

Ms. May advances only one argument in support of her claim that a reasonable fact finder could conclude that the reason Ms. Povinelli asked Ms. May to leave the Lincoln Hills facility upon her return from the hospital was because of her race: a few months prior, she says, Ms. Povinelli had allegedly made race-based comments to May about another CarDon employee named DeMarco.[8]  Specifically, Ms. May claims that,

---

[8] In Ms. May's deposition and her responses to interrogatories, she identified several white employees as similarly situated comparators, but in response to Defendant's summary judgment motion has failed to put forth any argument that these employees engaged in conduct of "comparable seriousness" to her own to enable the Court to determine whether the employees she has identified are in fact similarly situated under the law. *See Dunlevy v. Langelder*, 52 F.4th 349, 353–54 (7th Cir. 2022) ("Employees are similarly situated if they dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.") (internal quotation marks and citation omitted); *Coleman v. Donahoe*, 667 F.3d 835, 850–51 (7th Cir. 2012) (identifying the relevant question as whether purported comparators engaged in "similar—not identical—conduct to qualify as similarly situated"). Again, as the Seventh Circuit has repeatedly recognized, "perfunctory and underdeveloped

during a conversation between herself and Ms. Povinelli, Ms. Povinelli stated in reference to DeMarco, who is described as an approximately 20-year-old CNA who worked for CarDon, that "this kind don't act right" and that "they complained too much." (May Dep. 151:21–25, 179:4–8.) Ms. May claims that Ms. Povinelli was speaking of DeMarco's race (African-American) when she made those comments (*id.* at 151:18–20), maintaining that this incident supports an inference that Ms. Povinelli acted with racial animus when dealing with her as well.

Ms. Povinelli admits making these comments but testified that they were in reference to DeMarco's age, not his race, as was clear from the fact that they were made in the context of a discussion with Ms. May about "the younger generation's general work ethic."  (Povinelli Decl. ¶ 14.) Ms. May concedes that Ms. Povinelli never specifically mentioned DeMarco's race when making these comments and acknowledges the possibility that the comments were in fact about age, although Ms. May does not recall ever having a specific conversation with Ms. Povinelli about the "younger generation." (May Dep. 177:16–178:5, 179:4–17.)

Assuming that Ms. Povinelli was indeed referencing race when she commented upon DeMarco's behavior, these comments, without more, do not raise an inference of racial animus or discrimination regarding Ms. Povinelli's treatment of Ms. May. "For biased comments to reflect discriminatory motive, they must have been made by the decisionmaker around the time of, and in reference to, the adverse employment decision."

---

arguments, and arguments that are unsupported by pertinent authority are waived." *Greenbank*, 47 F.4th at 629.  We therefore do not address this contention further.

*Salgado v. Graham Enter. Inc.*, 861 F. App'x 91, 94 (7th Cir. 2021) (citing *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 885 (7th Cir. 2016)). Although there is no dispute that Ms. Povinelli was the employer's decisionmaker in this case, her comments were neither made near the time of Ms. May's alleged constructive discharge nor in reference to that employment decision.

Although Ms. May cannot pinpoint precisely the time of Ms. Povinelli's comments (May Dep. 152:1–2), she does not dispute that they were made at least "a few months" prior to her purported constructive discharge. (*id.* at 132:13-16.) Although "[t]here is no bright line for when a decisionmaker's remarks are timely enough [to] support an inference of discrimination," *Almblade v. Wormuth*, No. 4:20-cv-04196-SLD-JEH, 2021 WL 4341931, at *7 (C.D. Ill. Sept 23, 2021), the Seventh Circuit has considered comments made two to three months before the adverse employment action to be too remote in time to raise an inference of discrimination. *See*, *e.g.*, *Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012); *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 722 (7th Cir. 2008) (citations omitted). Additionally, there is no dispute here that Ms. Povinelli's comments were made about a different employee without any connection to Ms. May's constructive discharge. *See Bragg v Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 274 (7th Cir. 2023) (finding that racist comments directed at others in the plaintiff's racial class insufficient to support an inference of bias directed against the plaintiff).

Accordingly, we hold that these comments are insufficient in raising an inference of discrimination against Ms. May. Although Ms. Povinelli was the decisionmaker with regard to Ms. May's employment, her comments were not made to or otherwise about

Ms. May and were unrelated to the adverse employment action. Further, they were not contemporaneous to the constructive discharge itself, having occurred at least a few months before Ms. May was directed to leave work and not return. As this is the only argument that Ms. May has sufficiently developed to support her race discrimination claim, again viewing the evidence holistically, we find that no reasonable juror could find that Ms. May was constructively discharged because of her race.

### **Conclusion**

For the reasons detailed above, we <u>GRANT</u> Defendant's Motion for Summary Judgment [Dkt. No. 39]. Final judgment shall be entered accordingly.

IT IS SO ORDERED.

Date:   9/7/2023

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Andrew Dutkanych, III
BIESECKER DUTKANYCH & MACER LLC (Indianapolis)
ad@bdlegal.com

Tyler John Moorhead
BOSE MCKINNEY & EVANS LLP
tmoorhead@boselaw.com

Tyler J. Moorhead
Bose McKinney & Evans, LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204

Emily M Stultz
Biesecker Dutkanych & Macer, LLC
estultz@bdlegal.com

David L. Swider
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
dswider@boselaw.com